UNITED STATES v. DAVIES, TURNER & CO.

(Circuit Court of Appeals, First Circuit.   March 4, 1910.)

No. 841 (2,053).

1. CUSTOMS DUTIES (§ 36*)—CONSTRUCTION OF TARIFF LAWS—CLASSIFICATION—HANDMADE PRINTING PAPER.

Under Tariff Act July 24, 1897, c. 11, § 1, Schedule M, pars. 396, 401, 30 Stat. 187, 189 (U. S. Comp. St. 1901, pp. 1671, 1672), handmade printing paper is dutiable as "handmade" rather than as "printing paper," even when suitable for printing.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 115-120; Dec. Dig. § 36.*]

2. CUSTOMS DUTIES (§ 36*)—CONSTRUCTION OF TARIFF LAWS—POLICY OF LAW—HISTORY OF LEGISLATION.

In construing the application of the terms "handmade" and "printing" as applied to paper imports, consideration was given to the evident intent of Congress (1) as revealed in numerous successive tariff acts to reduce the duties on printing paper for the benefit of the ordinary reading public, and (2) by elevating handmade paper into a new class, now that it has become in the art of printing a luxury.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 115-120; Dec. Dig. § 36.*]

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For decision below, see 172 Fed. 298.   The Circuit Court reversed a decision by the Board of United States General Appraisers, which had affirmed the assessment of duty by the collector of customs at the port of Boston.

D. Frank Lloyd, Deputy Asst. Atty. Gen. (Martin T. Baldwin, Sp. Atty., of counsel), for the United States.

Comstock & Washburn (Albert H. Washburn, of counsel, and Searle & Pillsbury and George J. Puckhafer, on the brief), for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge.   This appeal relates to the classification of handmade paper.   The importers claim that it should have been classified under paragraph 396 of the customs act of 1897 (Act July 24, 1897, c. 11, § 1, Schedule M, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671]), "Printing paper, unsized, sized or glued, suitable for books and newspapers," beginning with such paper "valued at not above two cents per pound," carrying a duty of 0.3 cent per pound, and closing it with such paper valued "above five cents per pound," carrying a duty of 15 per cent. ad valorem.   The United States claim that it should be classified under paragraph 401 as "handmade paper, weighing not less than ten pounds and not more than fifteen pounds to the ream," assessed at 2 cents per pound and 10 per centum ad valorem, or "weighing more than fifteen pounds to the ream," paying 3½ cents per pound and 15 per centum ad valorem, and followed by a provision

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that "every one hundred and eighty thousand square inches shall be taken to be a ream." The Circuit Court decided in favor of the importers, feeling itself persuaded to follow decisions of the United States Circuit Court of Appeals for the Second Circuit.

Aside from any peculiar rules in reference to the interpretations of customs statutes established by decisions of the courts, the interpretation claimed by the United States is the natural reading of the statute. It is true that handmade paper falls within the general description given by paragraph 396; but the word "handmade" is denominative, and not merely descriptive. It is a name, and is specific, and not general, and therefore, on the natural reading of the statute, controls, although, of course, under some circumstances, the common sense of the matter, and the force of other provisions of a statute, and the surrounding circumstances, might make what is descriptive overrule that which enumerates.

Our rule of interpretation, we understand, is the same as that applied by the Supreme Court in Robertson v. Glendinning, 132 U. S. 158, 159, 160, 10 Sup. Ct. 44, 33 L. Ed. 298, and in United States v. Perry, 146 U. S. 71, 75, 13 Sup. Ct. 26, 36 L. Ed. 890. In view of those decisions, which run so close to the case before us, it is only necessary to paraphrase them to sustain absolutely the present proposition of the United States.

Moreover, the general history of this particular art leads directly to this result. Handmade paper first appears eo nomine in the tariff act of 1897. The modern history of dutiable printing paper is as follows: Commencing with Act July 30, 1846, c. 74, 9 Stat. 42, the revenue tariff act, following through the two acts of March 3, 1857 (11 Stat. 192, c. 98), and March 2, 1861 (12 Stat. 179, c. 68), which were still revenue acts, the latter somewhat advanced on account of the necessities of the war, printing and book paper, unsized, paid relatively duties of 20 per cent., 15 per cent., and 30 per cent. ad valorem. Act March 3, 1863, c. 77, 12 Stat. 742, restored the duty of 20 per cent., which continued through Act June 6, 1872, c. 315, 17 Stat. 230. In 1883 (Act March 3, 1883, c. 121, 22 Stat. 488) this duty was reduced to 15 per cent., and so it continued until the act of 1897. In 1872 a new class, consisting of sized and glued printing paper, was assessed at 25 per cent. ad valorem, and so continued until 1883, when it was assessed at 20 per cent. ad valorem. In 1897 both sized and unsized ordinary printing paper were run into one class, as we have shown. Thus it appears that, in the face of the general advance in customs duties, the rates on printing paper in ordinary use were constantly reduced. It needs no argumentation to establish the proposition that this reduction was for the benefit of the ordinary reading public, and not for the benefit of any exclusive class or of any class using paper of exclusive manufacture.

Pulp for the manufacture of paper, this being from grass, first appeared in 1870 as free. After that, ordinary paper for printing both books and newspapers was rapidly cheapened by the introduction of machinery capable of making and using wood pulp. It is a matter of common knowledge that handmade paper is now relatively a luxury.

This apparently attracted attention in 1897. The common sense of the matter is that handmade paper was then elevated into a new class, and was thus especially distinguished from the ordinary printing paper for books and newspapers, and thenceforth segregated in the customs laws, carrying a higher rate of duty. The result is that the diminishing rates of duty, intended for the benefit of the general reading public, should be held to cover only such paper as that public uses, in favor of diffusing general literature and the knowledge of the news of the world. There is no reason that can be advanced why Congress should continue to give the users of handmade paper the constantly diminishing rates of duties imposed on common printing paper.

Emphasis is placed on the fact that, with reference to paper for books and newspapers, the word "only" and the world "exclusively," found in previous acts in this connection, have been dropped out in the act of 1897. The previous acts read in substance: "Printing paper suitable only for books and newspapers." Paragraph 396, in question here, reads: "Printing paper suitable for books and newspapers." The object of this change, of course, was simply to broaden out in favor of the ordinary reader or the manufacturer of ordinary reading paper, so that they may not be embarrassed by the narrowing words "only" or "exclusively." This fully accounts for their omission; and, at any rate, no sound argument can be built up from it in favor of importers of handmade paper.

Apparently, also, there is no settled practice of the departments with reference to this word "handmade." It never came into the statute until 1897; and while, according to the testimony of the importers here, there was a period continuing for some time in which they paid duties on handmade paper which could be used for printing at the rates provided in paragraph 396; nevertheless, in the collection district of New York, a different practice seemed to prevail. It appears that, previous to January 27, 1902, the customs officers at New York assessed this duty under paragraph 401. This was sustained by the General Appraisers (T. D. 23,486; G. A. 5,067) by decision dated January 27, 1902. This is the identical assessment which came before the Circuit Court for the Southern District of New York in Miller v. United States, 128 Fed. 469, decided on January 29, 1904. Very clearly there is not enough in the record to sustain the proposition that there was any settled usage in favor of the importers for any length of time, according to the practical rules usually applied with regard to that topic.

The only question, therefore, is whether the decisions in the Second circuit are to have the effect given to them by the Circuit Court. On a careful study of them, they do not seem to be of sufficient breadth and clearness to require us to depart from what is the natural interpretation of the statute in question. Otherwise we would, as usual, follow them. The original case on which the importers rely, Miller v. United States, affirmed by the Circuit Court of Appeals, 135 Fed. 349, 68 C. C. A. 131, has been more or less cut down by the same Court of Appeals in Benneche v. United States, 153 Fed. 861, 83 C.

C. A. 43, and United States v. Seyd, 158 Fed. 408, 85 C. C. A. 518, although it is true, as said by the Circuit Court here, the precise condition of facts involved in the Miller suit was not before the court in either of the two last cases.

The judgment of the Circuit Court is reversed, and the case is remanded to that court, with directions to enter a judgment in favor of the United States.